# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

February 19, 2019

*By and ECF*
The Honorable Richard J. Sullivan
United States Circuit Judge
Court of Appeals for the Second Circuit
40 Foley Square
New York, New York 10007

Re:   *United States v. Daniel Sherlock*, 17 Cr. 597 (RJS)

Hon Judge Sullivan:

  Following a guilty plea, Daniel Sherlock is scheduled to for sentencing for possessing child pornography in violation of 18 U.S.C. section 2252A(a)(5)(B).

  There can be no dispute that Daniel faces substantial ▮ challenges—▮ —that are intertwined with his offense. However, since his arrest, Daniel has been placed in a living/treatment facility where the treatment plan is tailored to bring his symptoms under control. While he has a long ways to go, Daniel has already made strides; as his probation officer and therapists confirm, Daniel is sticking with his rigorous treatment schedule and is making steady progress. Given the headway he had made, continued ▮ treatment is the best route to ensure both Daniel's and the community's safety.

  In contrast, sending Daniel to prison would severely disrupt the delicate progress he has made, and stunt his nascent rehabilitation. Aside from the personal dangers Daniel would face in prison as a ▮ sex offender, the type of ▮ treatment that has been so instrumental in his recent recovery would be beyond his reach. For these reasons and those that follow, we request that the Court sentence Daniel to time served followed by five years of post-release supervision. A five year period of federal supervision (in addition to supervision as a registered sex-offender) will fulfill all the goals of sentencing.

The Honorable Richard J. Sullivan                    February 19, 2019
Page 2 of 12

Re:     *United States v. Sherlock*, 17 Cr. 597 (RJS)

## BACKGROUND

A. <u>A difficult upbringing</u>



███████████████ was compounded by tragedy. Months later, Daniel's older brother, Michael, became ill with a lung infection and was hospitalized for the next six years, eventually on life support, until the family decided to take him off life support. Naturally, the family's attention shifted away from Daniel to Michael.

---

1 ███████████████████████████████████████████████

The Honorable Richard J. Sullivan          February 19, 2019
Page 3 of 12

Re:   United States v. Sherlock, 17 Cr. 597 (RJS)

This was hard on Daniel, who loved and worshipped his brother but was himself struggling to keep up in school, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ and now, to cope with his brother's illness.

    Tragedy struck again in 2010 when Daniel's father, Thomas, fell from a roof and suffered a heart attack, leaving him confined to a bed and requiring 24/7 care. Yet again, Daniel responded with kindness by helping his father perform daily tasks as he tried to recover in his last months, before finally succumbing to his injuries in 2011. Daniel also cared for his grandmother, who lived with his family at the time and had been diagnosed with stage 4 lung cancer. However, after four years on chemotherapy, Daniel's grandmother passed away, leaving him and his mother by themselves.

    Daniel eventually completed high school ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉, but Lynn was determined to have Daniel work and make some sort of living. Through family connections, Daniel was able to obtain a variety of jobs, but was always let go, usually because he could not keep up with his responsibilities. Years after his graduation, Lynn eventually helped Daniel get certified in IT services, and Daniel was able to work in that industry thanks to generous, understanding and patient supervisors who accommodated Daniel's shortcomings. Still, after all that, Daniel remained unable to achieve basic self-sufficiency—he could not maintain a simple checking account or pay his bills, requiring Lynn's constant oversight.

    In 2014, Daniel was arrested for viewing child pornography on his computer. He was convicted of New York Obscenity in the Third Degree and sentenced to three years' probation. However, following his sentencing, Daniel remained living at home, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Also, although his home computer was monitored, Daniel continued to work in IT with the New York City Health and Hospitals Corporation, where he interacted with computers all day, every day, where he faced the temptation to act on his periodic compulsions.

    B. <u>The offense and its aftermath</u>

    In April 2017, Daniel downloaded child pornography onto his employee computer. Also found on the computer were two apology letters to the children

The Honorable Richard J. Sullivan  February 19, 2019
Page 4 of 12

Re:   United States v. Sherlock, 17 Cr. 597 (RJS)

depicted in the images. In one letter, Daniel wrote: "I understand if you don't want to read this apology, but I need to write and let you know how ashamed I am for looking at your abuse online." (PSR ¶ 27.) In another letter, Daniel wrote: "I assure you did nothing wrong, this is not your fault. In no way I asking you to forgive me, but live your life the best way that can." (PSR ¶ 28.)

As the letters show, Daniel felt extreme remorse for his crime even while committing them, descending into depression and self-loathing. These feelings were magnified following his arrest—two days later, on August 4, 2017, Daniel told his mother ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

### C. Progress in mental health treatment

After a tumultuous period following his arrest, Daniel has shown substantial improvement at ███████████████████████████████████████. Daniel has worked hard to take an active role in his treatment, addressing the issues that led to the present offense, and his efforts have been well-received. (See, e.g., Ex. A (Cromer Ltr.).) As Daniel's probation officer reports, at Pilgrim, "most reports from the facility are good." (PSR ¶ 78.) In addition, Daniel attends outpatient treatment at ███████████████████████████████, New York, where the treatment is specifically focused on sex-offense issues.

The treatment has shown dividends. After █████████████, Daniel felt like he was a monster and irredeemable, but now reports positive self-esteem based on his therapy. He has also developed self-sufficiency skills by working at ██████, including by cleaning the dining room or helping with dinner. And most significantly, though afforded substantial autonomy, Daniel has demonstrated that he is on the path to rehabilitation. Not only has he avoided reoffending, but Daniel

The Honorable Richard J. Sullivan                                February 19, 2019
Page 5 of 12

Re:   *United States v. Sherlock*, 17 Cr. 597 (RJS)

reports feeling no compulsion to do so, showing that his treatment is having the desired effect.

## ARGUMENT

To determine an appropriate sentence, courts use as their "lodestar the parsimony clause of 18 U.S.C. § 3553(a), which directs sentencing courts to 'impose a sentence sufficient, but not greater than necessary to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)," namely, "proportionality, deterrence, incapacitation, and rehabilitation." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013). Courts may use the guidelines range as a "starting point," but that range is not presumptively reasonable. *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). Instead, courts must conduct an "independent review of the sentencing factors" to reach a just and fair sentence given the circumstances. *Id.* at 189. In this case, a sentence of time served followed by five years of post-release supervision would best achieve the goals of 18 U.S.C. section 3553(a).

### I.   The Court should not follow the disavowed sentencing guidelines for non-production offenses

Mr. Sherlock does not dispute the government's guidelines calculation, which yields an advisory range of 63-78 months. But the applicable guidelines under section 2G2.2 do not merit deference and should not be followed by the Court.

As the Second Circuit first recognized in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), the child pornography guideline, section 2G2.2, "is fundamentally different from most [guidelines] and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Dorvee*, 616 F.3d at 184. Unusually, "the Commission did not use th[e] empirical approach in formulating the Guideline for child pornography. Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties." *Id.* The result irrationally increases a defendant's advisory sentencing range based on conduct inherent in the crime. *Id.* at 184–88 ("many of the § 2G2.2 enhancements apply in nearly all cases . . ." thus, "[a]n ordinary first-time offender is therefore likely to qualify for a sentence . . . rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction"). Each of the

four enhancements specifically criticized by the Court of Appeals in *Dorvee* apply in this case, *i.e.*, for (1) an image with a prepubescent minor, (2) an image portraying sadistic or masochistic conduct or other forms of violence, (3) use of a computer, and (4) a high number of images. *See Dorvee*, 616 F.3d at 186.

Following *Dorvee* and other criticism of the child pornography guideline from courts and commentators across the country, the Sentencing Commission released a report to Congress on the child pornography guidelines for non-production offenders. *See* U.S. Sent'g Comm'n, Report to the Congress: Federal Child Pornography Offenses (2012) ("USSC Report"). The Commission explained that because the enhancements for computer use and type and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate among offenders in terms of their culpability." *Id.* at iii, xi, 209, 323. It explained that "technological changes have resulted in exponential increases in the volume and ready accessibility of child pornography, including many graphic sexual images involving very young victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6. Because "sentencing enhancements that originally were intended to provide additional proportional punishment for aggravating conduct now routinely apply to the vast majority of offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders regarding their culpability for their collecting behaviors," *id.* at 323. The Commission concluded that "[t]he current sentencing scheme in §2G2.2 places a disproportionate emphasis on outdated measures of culpability regarding offenders' collecting behavior and insufficient emphases on offenders' community involvement and sexual dangerousness." *Id.* It asked Congress to enact legislation to provide it authority to amend this guidelines. *Id.* at xviii, 322.

Finally, last year, the Second Circuit extended the reasoning of *Dorvee* and the USSC Report in *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017). According to *Jenkins*, "[s]ince the Commission has effectively disavowed § 2G2.2, it should be clearer to a district court than when we decided *Dorvee* that this Guideline 'can easily generate unreasonable results.'" *Jenkins*, 854 F.3d at 190 (quoting *Dorvee*, 616 F.3d at 188).

This Court should therefore not anchor its sentence to the disavowed and disapproved Guideline, section 2G2.2, in any way. It should instead weigh the other § 3553(a) factors to arrive at the parsimonious sentence.

The Honorable Richard J. Sullivan  February 19, 2019
Page 7 of 12

Re:   United States v. Sherlock, 17 Cr. 597 (RJS)

> II. **Each of the 3553(a)(2) factors favors a non-prison sentence where Daniel can continue his successful mental health treatment**
>
>> A. <u>Because of Daniel's ▮▮▮▮▮▮, a time-served sentence would be proportionate to his possession-only crime</u>

There is no minimizing the nature of Daniel's crime. Consumption of child pornography fuels its creation, and the public has a strong interest in condemning the scourge of child exploitation. But as courts have recognized, there is a wide continuum of activities under child pornography offenses. On the most serious end are producers of child pornography, who, by definition, are engaged in the direct sexual exploitation of a minor. *See United States v. R.V.*, 157 F. Supp. 3d 207, 210-211 (E.D.N.Y. 2016). On the other end of the spectrum are possession-only offenders, who often—like here—lack any intention of actual contact with a minor. *See id.* Indeed, those convicted of purely possession-related offenses are statistically unlikely to ever engage in direct contact with a minor,[2] and the government does not suggest that Daniel poses any risk of doing so. And so, without minimizing the gravity of Daniel's offense, the Court should also recognize that his conduct lies at the least serious end of the spectrum of child pornography offenses. *See Jenkins*, 853 F.3d at 190 (reversible error for sentencing court to not "account for the important differences between the sentence [defendant] and those who produced or distributed child pornography or who physically abused children received").

The nature of Daniel's offense is further mitigated by his personal characteristics. To start, as extensively chronicled in the PSR, ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[2] *See, e.g.*, Melissa Hamilton, *The Efficacy of Severe Child Pornography Sentencing: Empirical Validity or Political Rhetoric?*, 22 Stan. L. Pol'y Rev. 545, 580–81 (2011) ("Contrary to what may appear logical, the correlation between pedophilia and sexual contact offenses against children is not very strong." (footnotes omitted))

[3] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The Honorable Richard J. Sullivan  February 19, 2019
Page 8 of 12

Re:   United States v. Sherlock, 17 Cr. 597 (RJS)



### B. A lengthy period of strict supervision would provide adequate deterrence to similarly situated individuals

As a threshold matter, general deterrence should assume a less prominent role in this case, given the unique circumstances of the defendant. As explained above, Daniel ███████████████████████████████████, and it is unlikely that similarly situated individuals are scouring the federal dockets to compile sentencing decisions. Instead, where a child pornography offense is intertwined with ███████████████, the efficacy of general deterrence is reduced. ███████████████

---

4 ███

The Honorable Richard J. Sullivan       February 19, 2019
Page 9 of 12

Re:   *United States v. Sherlock*, 17 Cr. 597 (RJS)

In any event, for those that can be deterred, the proposed sentence accomplishes that aim. Throughout the years of supervision, Daniel will be subject to extremely limiting conditions, including a complete lack of privacy, being prohibited from accessing any medium of social networking, and being unable to have contact with any child. (*See* PSR at 29.) In addition, to comply with his directives for treatment, Daniel will be largely confined to ▮▮▮▮, severely curtailing his liberty. A lengthy period of supervised release should therefore not be mistaken for lenient treatment, and would not be seen as such by a putative offender.

   C.   <u>Daniel's rehabilitation and public safety would be best served by continuing Daniel's</u> ▮▮▮ <u>treatment</u>

Following his placement at ▮▮▮, Daniel has shown a delicate, yet marked improvement. This is no accident. It is the culmination of an intensive and aggressive treatment program—▮▮▮▮▮▮—that addresses the root causes of Daniel's offense conduct.

Of course, Daniel has a prior conviction for child porn pornography, and so the question naturally arises: what is different this time? In a word, everything. To start, after his prior conviction, Daniel returned to live at home, and while his mother cares about him deeply, ▮▮▮▮. In contrast, Daniel now lives at ▮▮▮ and is thriving under the structure that the facility has offered him. There, not only does he receive the necessary level of treatment, but he is removed from an environment of computers that could otherwise provide temptations.

The scope of the specificity of Daniel's therapy is also vastly different. While Daniel did previously have weekly sessions with a psychologist, he now attends specialized sex offender treatment, as well as other forms of therapy to ▮▮▮▮▮ teach him the skills he needs to be independent. As Daniel's mother has seen, the difference is manifest:

> After his state conviction, [Daniel] met with a therapist ▮▮▮ ▮▮▮. He didn't get along with his therapists as they were not as experienced and understanding as the professionals he works with now. In the ▮▮ program, he attends sex offender treatment once a week and group or individual therapy four times a week. He finds the sex offender treatment to be much better,

> and the other sessions focus on additional aspects of his well-being like his self-esteem. I think this is very important. Before, Daniel saw himself as a monster and he would ask me, Mom, why did God make me this way? His treatment before didn't make him feel like he could become a better person, and I think that's what led him to attempt suicide. Now, he is more optimistic. He realizes he has a problem but also, that if he works hard in treatment he can fix it.

(Ex. B (Lynn Sherlock Ltr.) at 3.) Daniel himself echoes these comments:

> The [] program is helping me to become a better person. Before I did not have much support for my problem. Now, in addition to the support from my mom and my family, I have support from, the sex treatment therapy and the support groups I go to. I am also getting help for depression, and in dealing with the losses of my brother and father at a young age. I have made friends at the program and the staff members say I am doing very well.

(Ex. C (Daniel Sherlock Ltr.).) While Daniel has suffered more than his fair share of misfortune over his life, he is lucky to have an array of [] tools dedicated to his rehabilitation.

Daniel's nascent rehabilitation, however, would be sabotaged if he were sent to prison. While the Bureau of Prisons offers [], it would pale in comparison to the panoply of services that Daniel is availing himself of now and which have been so critical to his treatment. And, more to the point, there is no sense risking Daniel's progress by interrupting his current, demonstratively effective treatment plan in favor of one of unknown efficacy.

Lack of adequate treatment is not the only downside of incarceration. Given Daniel's [], he is not likely to fare well in the social setting of prison. [] Indeed, Daniel possesses many characteristics that courts have found expose individuals to sexual assault in prison, including being a young, [] child sex offender with a weak/nonassertive demeanor and no experience in prisons. *See United*

Re:     *United States v. Sherlock*, 17 Cr. 597 (RJS)

*States v. D.W.*, 198 F. Supp. 3d 18, 61 (E.D.N.Y. 2016); National Prison Rape Elimination Commission Report at 7-8 (June 2009), *available at*: https://www.ncjrs.gov/pdffiles1/226680.pdf. The only way to protect Daniel's physical safety in prison would be to place him in mentally-devastating protective custody, *see D.W.*, 198 F. Supp. 3d at 87, which, far from advancing his rehabilitation, would unravel the progress Daniel has made.

### III. A non-prison sentence would be in line with a broad trend of such sentences in comparable possession cases

Over the past several years, there has been a nationwide recognition of the harshness of the child pornography guidelines, leading courts across the country to impose below-guidelines sentences in such cases. *See R.V.*, 157 F. Supp. 3d at 264-265 (collecting cases from around the country where district courts have imposed, and circuit courts have affirmed, sentences with minimal or no incarceration for defendants convicted solely of possessing child pornography).

In this district specifically, judges have not hesitated to impose noncustodial sentences for child pornography possession offenses where—like here—significant mitigating factors exist. *See, e.g., United States v. Ivan Rivera Gallegos*, 14 Cr. 432 (JPO) (2017) (sentencing defendant to time served (one day) and three years' supervised release); *United States v. Roland Gabriel*, 16 Cr. 765 (KBF) (2017) (three years' probation); *United States v. Sauer*, 16 Cr. 565 (CS) (2017) (time served (one day) and five years' supervised release); *United States v. Scott Meyer*, 14 Cr. 183 (JGK) (2016) (five years' probation and six months' community confinement); *United States v. Angelo Trinidad*, 14 Cr. 537 (NRB) (2015) (time served (less than one day) and five years' supervised release); *United States v. Daniel Pinero*, 14 CR 341 (AJN) (2015) (time served (one day) and three years' supervised release with one year of home detention; guideline range of 78 to 97 months); *United States v. Patrick Colon*, 12 Cr. 462 (VB) (2013) (time served (one day) and five years' supervised release); *United States v. Christopher Ressa*, 11 Cr. 939 (RPP) (2013) (time served (around three days; (imposing sentence of time served of around three days and supervised release with guidelines range of 78-97 months); *United States v. Hector Garcia*, 10 Cr. 914 (BSJ) (2012) (probation); *United States v. Leonardo Morel-Baca*, 11 Cr. 427 (DAB) (2012) (time served (one day;) and supervised release; guideline range of 78-97 months); *United States v. Robert Santana*, 10 Cr. 341 (SHS) (2011) (three years' probation and six months' community confinement); *United States v. Marvin Falikovic*, 07 Cr. 906 (NRB) (2008) (time served and three

The Honorable Richard J. Sullivan                                    February 19, 2019
Page 12 of 12

Re:    United States v. Sherlock, 17 Cr. 597 (RJS)

years' supervised release); *United States v. John Balkam*, 05 Cr. 689 (DLC) (2006) (sentencing defendant to probation; range was 46-57 months). As such, not only would this Court be in good company by granting a non-custodial sentence, but such a result is necessary to prevent sentencing disparity between Daniel and other offenders with similar levels of mitigating factors.

## CONCLUSION

The interests of both Daniel and the public are served by the same outcome—where Daniel is adequately treated ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, ensuring that he never repeats his offense conduct. That outcome can be achieved, and *is being* achieved, exactly where he is right now, and the Court's sentence should encourage this continued rehabilitation. For these reasons, the Court should sentence Daniel to time served, followed by five years post-release supervision.

Respectfully submitted,

/s/
Sabrina P. Shroff
Assistant Federal Defender
*Attorney for defendant Daniel Sherlock*

cc:    Attorneys of Record (via ECF)

# EXHIBIT A

*Redacted*

# EXHIBIT B

*Redacted*

# EXHIBIT C

The Honorable Richard J. Sullivan
United States District Judge
40 Foley Square
New York, NY 10007

Dear Honorable Judge Sullivan

My name is Daniel Sherlock, I am writing to you concerning your decision in my case. I know what i did was wrong I tried ▮▮▮▮▮▮▮▮▮▮ I am so ashamed of myself. I apologize for my actions and take full responsibility for what I have done. It was never my intention to hurt anyone and I am truly sorry if anyone was harmed because of my poor decisions. It has always be difficult for me to understand things. and I was in special classes my whole life.

I ask you to please let me stay at the ▮▮ program. The program is helping me to become a better person. This is not the first time I have been arrested for possessing child pornography and I realize that I have a serious problem. Before I did not have much support for my problem. Now, In addition to the support from my mom and my family, I have support from, the sex treatment therapy and the support groups I go to. The people here are much nicer and understand ▮▮▮▮▮▮▮ more than therapists I have seen in the past. I am getting specialized sex offender treatment that is helping me get to the bottom of my problem. I am also getting help for depression, and in dealing with the losses of my brother and father at a young age. My treatment providers have encouraged me to focus on building relationships with other people. I have made friends at the program and the staff members say I am doing very well. My mom and I are very close and we need each other she helped me to write this letter (as did my attorney). I know I need to change and I want to make a better life for myself and to be there for my mom.

Sincerely,

Daniel Sherlock