J96KSHES

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4           v.                          17 CR 597 (RJS)

5   DANIEL SHERLOCK,

6               Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        September 6, 2019
9                                       10:15 a.m.

10  Before:

11              HON. RICHARD J. SULLIVAN,

12                                      Circuit Judge
                                        Sitting By Designation
13
                          APPEARANCES
14

15  GEOFFREY S. BERMAN,
         United States Attorney for the
16       Southern District of New York
    ALEXANDRA ROTHMAN
17  LOUIS PELLEGRINO
         Assistant United States Attorneys
18
    DAVID PATTON
19  FEDERAL DEFENDERS OF NEW YORK
         Attorney for Defendant
20  BY:  SABRINA P. SHROFF

21
    ALSO PRESENT:
22
    MICHELLE MILLAN, Probation
23

24

25

J96KSHES

1           (Case called)

2           THE COURT:  Good morning.  Let me take appearances.

3           For the government?

4           MS. ROTHMAN:  Good morning, your Honor.  Alexandra

5      Rothman and Louis Pellegrino, for the United States.

6           MR. PELLEGRINO:  Good morning, your Honor.

7           THE COURT:  Good morning.

8           And for the defendant?

9           MS. SHROFF:  Good morning, your Honor.  For Daniel

10     Sherlock, who's seated to my left, and his guardian, Lynn

11     Sherlock, who's seated to his left, Federal Defenders of

12     New York, by Sabrina Shroff.  Also present in court in the

13     case, in case you wanted to hear from her, is Dr. Cohen, and

14     she's seated in the front row.

15          THE COURT:  All right.  Good morning to each of you

16     and Dr. Cohen.  Thank you for being here today.  I've read your

17     report.

18          We were last here for sentencing on March 13th.  At

19     that time, I reviewed with everybody what I had received in

20     connection with sentencing, and then we were discussing the

21     need for some additional materials.  So, at that time, I

22     directed that an evaluation be done.  And then I thought I had

23     also asked that we have someone here from the program where

24     Mr. Sherlock is currently being treated.  So, what I had said,

25     at page 14 of that transcript, was I'm inclined to put this

J96KSHES

1    over, order this report, and then when we come back for

2    sentencing, have a representative from where he is now come to

3    court, so that I can ask that person some questions about the

4    treatment he's getting, the treatment he's going to need going

5    forward, so I can have a better understanding as to what

6    exactly is the plan for Mr. Sherlock.

7            But there's nobody here from Western Suffolk, or

8    Pilgrim, or any places where he's being treated; is that

9    correct?  That's really for Ms. Shroff.

10           MS. SHROFF:  No, your Honor.

11           THE COURT:  No?  Okay.

12           And why not?

13           MS. SHROFF:  Well, your Honor, I'm sorry, I did not

14   understand that just to be directed at me since the government,

15   in its submission, seemed to have contact with them and relied

16   on their reporting to support their conclusion.  But, more

17   importantly, honestly, I did not have them come because I don't

18   think that the treatment for Mr. Sherlock will simply be from

19   them.  I think that probation, along with Dr. Cohen, will have

20   a different treatment plan.  I'm not sure that the placement

21   there will be a continued placement forever.  I wasn't

22   necessarily sure --

23           THE COURT:  Well, I wanted to ask questions about the

24   treatment he was getting.

25           So, Dr. Cromer has sort of discussed this, and it's

J96KSHES

reflected or memorialized in the report of Dr. McCarthy, but I

anticipated we'd have somebody there who could say how he's

doing.

Now, we've had a few other data points along the way

since March 13th.  Maybe I should just state what else I've

received and reviewed in connection with sentencing since

March 13th.  So, on March 13th, I was talking about all the

things that were in the record that I had reviewed.  Since

then, I have now reviewed the transcript of that proceeding on

March 13th, where we put off sentencing.  I have also reviewed,

then, a March 18th submission from probation, from Ms. Millan,

who's here also in court, related to the sexual evaluation.  I

have reviewed the order that I issued, which also attached a

letter from Ms. Shroff.  So that was an order on March 22nd.

There, then, was another order from me on March 1st, another on

March 8th, a letter from Ms. Shroff on April 9th -- I'm sorry,

I said March 1st, I meant April 1st and April 8th, with letters

from Ms. Shroff on April 9th.

I then issued another order on April 9th, another on

April 15th, and then I got an action request from a John

Moscato from pretrial services on May 7th about a violation of

the bail conditions.  So, I then amended the bail conditions to

include drug testing and treatment on May 7th.

On May 23rd, I then got another notice of a violation

of bail conditions from Mr. Moscato.  This was related to the

J96KSHES

1   seizure of a phone from Mr. Sherlock and also that he had

2   tested positive for marijuana.  It reflected the marijuana

3   issue as well.

4          So, I issued an order on the 24th of May, scheduling a

5   conference.  Ms. Shroff sent a letter to ask me if we could

6   move that to another day, which we did, and then we were here

7   together on May 31st.  So I have reviewed the transcript of

8   that bail review hearing.  I kept Mr. Sherlock out even though

9   pretrial services and the government were, at least initially,

10  asking that I remand him.  But, in any event, I changed the

11  conditions to basically make it the equivalent of sort of home

12  confinement while he was at the facility.

13         So, I then have received a June 10th report, a

14  psychosexual evaluation from the New York Mental Health Group,

15  Jennifer McCarthy being the author.  That report is 27 pages,

16  single-spaced.  I then have a revised presentence report dated

17  August 20th.  There was one on July 31st, but the one I got was

18  August 20th, so I have reviewed that.

19         I then have reviewed an August 21st letter from

20  Ms. Shroff, which attaches Dr. Cohen's report, which is a

21  15-page -- no, 17-page submission.  I then have a letter from

22  the government dated August 29th, a two-pager, and then a

23  letter from Ms. Shroff dated September 5th, which is a

24  one-pager, that attaches, then, an addendum or response from

25  Dr. Cohen to certain portions of the government's letter.

J96KSHES

1          So, that's what I have received in connection with

2    sentencing.  Is there anything else that I have overlooked?

3               MS. ROTHMAN:  Not from the government, your Honor.

4               THE COURT:  Ms. Shroff?

5               MS. SHROFF:  No, your Honor.  Thank you.

6               THE COURT:  Okay.  All right.

7          Well, I guess we'll start with the presentence report,

8    the most recent presentence report.  So, Ms. Shroff, have you

9    had a chance to review that presentence report with your

10   client?

11              MS. SHROFF:  I did, your Honor.

12              THE COURT:  All right.

13         Do you have any objections to what's in the report?

14              MS. SHROFF:  No, your Honor.

15              THE COURT:  No?  All right.

16         So, Ms. Rothman, you have reviewed the presentence

17   report?

18              MS. ROTHMAN:  I have, your Honor.

19              THE COURT:  Do you have any objections to what's in

20   the report?

21              MS. ROTHMAN:  No, your Honor.

22              THE COURT:  Okay.

23         So, let's, I guess, go to the presentence report,

24   particularly with respect to the guidelines calculation.

25   Mr. Sherlock, you may remember, when you pleaded guilty, I told

J96KSHES

you about a number of factors that the Court has to consider
before imposing a sentence.

     Do you remember that?

     THE DEFENDANT:  Yes.

     THE COURT:  One of the things I talked about was the
United States Sentencing Guidelines manual.  Do you recall
that?

     THE DEFENDANT:  Yes, sir.

     THE COURT:  This is a while ago, but I told you that
this was a book that's pretty long, it's like 600 pages long,
but it's put out by a commission, and that's a commission that
is called the United States Sentencing Commission.  That
commission has some judges, and some lawyers, and some experts
in the field of criminal law.  The way this book works is that
it's designed to give guidance to judges like me, who have to
impose sentences on real people.

     So, for every crime or type of crime, there's a
chapter in this book, and the judge is directed to go to the
chapter that relates to the crime in a particular case.  And
once in that chapter, the judge makes findings based on certain
prompts in the book.  And then the judge -- once the judge
makes findings, the judge then assigns points according to
what's in this book.  It's kind of like accounting.  The judge
makes a finding, assigns points, adds up those points, in some
cases subtracts points, but, ultimately, the judge comes up

J96KSHES

with a number.  That number is referred to as the offense

level.

          The judge then goes to another chapter in this book,

and that's a chapter that relates to criminal history.  And not

surprisingly, people who have committed crimes before and been

sentenced to prison perhaps, well, they will be treated more

harshly than a person who has no prior convictions.  So, the

judge looks at the person's criminal history and what's in that

chapter, the judge assigns points based on whether there were

prior convictions, the length of time that was imposed for

those convictions, the judge adds up those points, and the

judge comes up with another number.  That number is referred to

as the criminal history category.  There are six criminal

history categories.  Category I is the lowest, the least

serious, and Category VI is the highest and most serious.

          Then with those two numbers that I talked about, the

offense level on the one hand and the criminal history category

on the other, the judge goes to the back of this book where

there's a chart or a grid.  I think Ms. Shroff may have handed

you a version of it, I'm not sure.  But, in any event, there's

a column here on the far left.  That's the offense level

column.  It starts at number 1 at the top and goes all the way

down to 43 at the bottom.  So I will go down that column until

I reach the number that I found to be the offense level in this

case.  I'll then go across these other columns, each of which

J96KSHES

reflects a criminal history category, and I'll go to the one that I found to be the appropriate criminal history category. And where my finger finally stops in that exercise, well, that is the range that the commission thinks would be appropriate for that crime, or for that offense level, and for that criminal history category.  It's a range in terms of months.

Now, it's not mandatory -- I don't have to follow this book -- but I do have to consider it, and I do have to make my findings under it.  I have to announce those findings.

Now, there are other factors that are just as important as this book.  I'll mention those in a minute.  I think I mentioned them on the day you pled guilty.  But for now, we're going to spend a few minutes talking about this book and how it applies in this case.  So, as I said, it can seem a little technical.  It can seem a little dry.  It is, frankly, a little dry, but it is important.  And I don't think there's any real dispute here, so I'll get right to it.

So, beginning on page 9 of the report, the probation office believes that the base offense level is level 18 because of this crime.  You pled guilty to a possession of child pornography.  That crime is covered by Section 2G2.2 of the sentencing guidelines.  The base offense level is 18.

I then add two levels because the material involved a prepubescent minor, so that's a two-level increase pursuant to 2G2.2(b)(2).

J96KSHES

1      I then add four levels because some of the material

2  portrayed sadistic or masochistic conduct towards the victims,

3  towards the children, that are depicted in the images.  So

4  that's a four-level increase pursuant to 2G2.2(b)(4).

5      There is then an additional two-point level because

6  this crime involved the use of a computer -- they almost all do

7  these days, but it's not necessarily the case -- and the

8  guidelines call for an additional two levels for the use of a

9  computer for the receipt or possession of materials like this.

10      Because at least ten images, but fewer than 150 images

11  were found or possessed by you, that results in another

12  two-level increase pursuant to 2G2.2(b)(7)(A).  So the grand

13  total of all of that is 28.

14      Because you pled guilty without going to trial,

15  because you accepted responsibility, because you saved the

16  Court and the government the time and resources necessary to

17  try the case, you get a benefit for that.  And so, I will

18  reduce that level by three because of your acceptance of

19  responsibility pursuant to Section 3E1.1 of the guidelines.  So

20  that puts us, then, at a total offense level of 25.  That's

21  according to what's in the presentence report.

22      Does anybody object to that?  Anybody think that

23  that's inaccurate or incorrect?

24      MS. ROTHMAN:  No, your Honor.

25      THE COURT:  Ms. Shroff?

J96KSHES

1        MS. SHROFF:  No, your Honor.

2        THE COURT:  Okay.  So, level 25.

3        In terms of criminal history:  You have a prior

4    conviction for similar conduct in state court, not federal

5    court.  So it's a little different there, as you know.  But

6    that resulted in you, I guess, pleading guilty and being

7    sentenced to three years of probation.  So, that counts for one

8    point, one criminal history point.

9        However, because you committed this crime while you

10    were still under a term of probation in Nassau County, you get

11    two more points added.  If you commit a crime while you're on

12    supervision, the thought is that that makes you more culpable

13    than a person who wasn't being supervised.  So you get two more

14    criminal history points pursuant to Section 4A1.1(d) of the

15    guidelines, for a total of three criminal history points.

16        Three criminal history points puts you in Criminal

17    History Category II.  So, I is the lowest, II is next, VI is

18    the most serious.  So you're in Criminal History Category II.

19        Does anybody disagree with the criminal history

20    calculation?

21        MS. ROTHMAN:  No, your Honor.

22        THE COURT:  Ms. Shroff?

23        MS. SHROFF:  No, your Honor.  Thank you.

24        THE COURT:  So, that, then, results in a guidelines

25    range of 63 to 78 months.  So, in the view of the commission --

J96KSHES

and I guess in the ordinary case with an offense level of 25
and a criminal history category of II, the view of the
commission is that that warrants a sentence of 63 to 78 months,
so a little over five years to six and a half years.  So that's
according to this book.

          Now, as I said, this book is not the only
consideration.  It's not mandatory.  And I have to consider
this book, but I have to consider other factors as well.  Those
other factors that I mentioned to you when you pleaded guilty
include, first of all, your own personal history.  You're a
unique -- everybody's unique, and every sentence is unique.
Every defendant has his or her own unique set of
characteristics and experiences, and it's important for the
judge to consider that unique set of experiences and
characteristics in imposing a sentence.  So I have to tailor
this sentence to you as a person.  I don't have to just sort of
slavishly follow the guidelines.  I have to think, well, how
does this work for Mr. Sherlock?  That means looking at your
entire experience from your birth right up until now, okay?  So
you're complicated, everybody's complicated.  You've had a
range of experiences in your life and challenges in your life,
and I get that.  We've spent a lot of time talking about those
things here in court and also in the submissions that I have
received.  But I have to consider those things, and I have to
make sure that the sentence I impose is tailored to you.  I'm

J96KSHES

sure we'll talk about those things some more, but that's a

factor that I have to consider.

          Another factor that I have to consider relates to the

facts and circumstances of this crime.  Just as I have to

tailor this sentence to you as a person, I also have to tailor

the sentence to the crime.  That means looking at the details

of the crime.  Now, the book does that a little bit.  You know,

some of the things I just mentioned of the book sort of account

for some of the details of the crime, but I have to -- the book

can't do it all.  This is a blunt instrument.  It can't

possibly anticipate every unique case.  So I have to look at

the details, just what went on here, for how long did you do

this, where and when did you do it, what were your motivations,

why did you stop, what was the impact of this crime on victims?

All of that matters in fashioning a sentence, and I have to

make sure that the sentence I impose provides a just punishment

for this crime, that it fits the crime.

          I have to make sure that it promotes respect for the

law, so that's another factor I have to consider.

          An additional factor that I have to consider is the

need to deter or discourage you and others from committing

crimes like this in the future.  You've committed a crime like

this in the past.  I have to try to impose a sentence that will

send a message that you don't even attempt to do this again.  I

have to also, hopefully, send a message in my sentencing here

J96KSHES

today to other people, to others who might be engaged in or

might be considering this type of a crime, and the hope is that

they, too, will learn about this sentence, and they will be

affected by it, that your future conduct and the future conduct

of others might be affected by the sentence that I impose.

Now, it's hard to know -- I can't predict the future,

so it's very hard for me to know exactly what impact my

sentences will have on your future behavior or other people's

future behavior, but I have to use my best judgment.  That

means looking at your past behavior, it means assessing who you

are as a person, it also means thinking long and hard about

this crime and this type of crime, and think about what it

might require to send that message.  So that's an objective of

sentencing, to send the message, to discourage people from

engaging crime in the future.

Another factor that I have to consider are your own

needs while you're in custody.  So, to the extent that I impose

a custodial sentence, then I have to make sure that your needs

are being addressed.  Now, you have a unique set of needs,

different from a lot of other people.  I sentenced a guy

recently who was 78 -- 76 -- he was old, he had a lot of health

issues.  I've sentenced other people who are really young, 22,

healthy, strong, but they had a lot of other issues, maybe

substance abuse treatment issues, the need for a GED or

educational or job training programs.  So everyone's got their

J96KSHES

own needs.  I have to make sure that your needs are being

addressed during any time that you would be in custody.  So

that's an important factor.

          And, finally, the last factor that I have to consider,

in addition to all those others I mentioned, is the need to

avoid disparities or differences in the sentences of people who

are otherwise similar.  So, people who have engaged in similar

conduct, who have similar histories, should, as a general

matter, have similar sentences.  Now, no two people or cases

are exactly alike, and, of course, we know that, but where

there are similarities, then sentences should similar.  It

would be bad if sentences were all over the place.  If some

judges were imposing ten years and others were imposing no time

at all for similar conduct with defendants who are very, very

similar, that would look arbitrary, and it would probably

promote disrespect for the law.  So we want to have some

consistency in this process, but we also want to make sure that

every sentencing is tailored to the person and to the facts of

the case.

          So, my job is to balance all those things and to come

up with a sentence that does justice to all of them, even

though sometimes those things can be in tension with each

other.  There might be certain factors that argue really for a

harsher sentence, while others would argue for a more lenient

sentence.  So the balancing is the hard part.  It's the hardest

J96KSHES

1    thing any judge does.  It's the biggest responsibility any

2    judge has because a sentence has a huge impact on the life of

3    the defendant, and the life of the defendant's family, and

4    other people, too.  And that's, of course, the case.

5              So, I get it, but I have a lot of things to consider.

6              So, do you have any questions about those different

7    factors?

8              THE DEFENDANT:  No, sir.

9              THE COURT:  Okay.

10             So, what we're going to do going forward is I'm going

11   to hear from the attorneys.  They've written to me, and I've

12   gotten multiple submissions from them.  I've gotten a lot of

13   things that I told you about that I reviewed, but I'm going to

14   give the lawyers an opportunity to address the Court, to raise

15   some of the things they may have raised before, but perhaps to

16   raise new points, too, that's fine.  We're in no hurry.  Here

17   today, this is a very important decision that I have to make,

18   it's a very important day in your life, so we're going to take

19   as much time as we need to get it right because it is that

20   important.  Okay?

21             So we'll start with Ms. Shroff, I'll then hear from

22   the government.  Ms. Rothman, are you carrying the ball for the

23   government?

24             MS. ROTHMAN:  I am, your Honor.

25             THE COURT:  Okay.  And I'll allow them, perhaps, to

J96KSHES

1   respond to each other, so we won't have to be highly formal.  I

2   may have questions as we go.  But I guess one question I had

3   for the government is:  Are there any victims who wish to be

4   heard or who wish to make submissions, anything like that?

5               MS. ROTHMAN:  There are none in this case, your Honor.

6               THE COURT:  Okay.

7               So, the report indicated that there were victims that

8   were part of a series of what was identified as the Tweeting

9   series.  The victims were identified by number, but sometimes I

10  get letters from the victims, which are used in a lot of cases

11  because some of these images are downloaded all over the

12  country, but we don't have that.  We don't have any identified

13  victims at this point?

14              MS. ROTHMAN:  That's correct, your Honor.

15              THE COURT:  Okay.

16              So, ordinarily, victims would have a right to speak,

17  they'd have a right to be heard.  Here, it seems as though

18  there are no victims who have been identified, so we won't be

19  hearing from them, but we shouldn't imagine that this is a

20  victimless crime.

21              In addition to the lawyers and victims, if they were

22  here, you also have a right to address the Court.  So, you're

23  not required to, but you have a right to.  So I'll make sure

24  that you have an opportunity to speak if you'd like to.  Okay?

25              THE DEFENDANT:  All right.  Thank you.

J96KSHES

1          THE COURT:  So, Ms. Shroff, I'll start with you.

2          MS. SHROFF:  Your Honor, I know the Court already

3   addressed the sentencing guidelines.

4          THE COURT:  Yes.

5          MS. SHROFF:  Sorry, I seem to have lost my shoe.

6          I am sure the Court knows that United States v.

7   Dorvee --

8          THE COURT:  Of course.  These guidelines have been

9   criticized more than probably any other guidelines provision.

10          MS. SHROFF:  I just want to make sure I did my job and

11   mention Dorvee.

12          THE COURT:  I think it's in your letter.

13          MS. SHROFF:  Well, look, we've gone back and forth on

14   Mr. Sherlock, and more than most judges, I think this Court has

15   a very thorough understanding of who Mr. Sherlock is, the

16   challenges that he's had, and the challenges that are yet to

17   come for him.  And I do not want to even begin to pretend to

18   understand the challenges, given the low IQ, and, honestly,

19   whether he is an underreporter, a poor historian, a bad

20   informant, I really am not going to engage in that colloquy

21   here because the historical record supports that result from

22   the time he was in fourth grade, and surely nobody can say he

23   was positing or posturing when he was in fourth grade.

24          THE COURT:  Look, he clearly has issues that are not

25   typical --

J96KSHES

1          MS. SHROFF:  Right.

2          THE COURT:  -- of defendants we see.  No question

3    about that.

4          Can I interrupt you just for a second?

5          MS. SHROFF:  Of course.

6          THE COURT:  And you obviously get to speak as long as

7    you like.

8          But I was, candidly, troubled by Dr. Cromer's

9    statements to Dr. McCarthy.  So, Dr. Cromer's letter that you

10   attached to your original sentencing submission, as I mentioned

11   last time, says almost nothing.  It's very short.  It basically

12   says he's attending treatment.  It describes or characterizes

13   his attendance as good, basically, but it doesn't say much.

14   But what Dr. Cromer said to Dr. McCarthy was more expansive and

15   not particularly flattering, actually.  It did suggest that

16   Mr. Sherlock does not really seem to be that serious about

17   treatment, that he hasn't really engaged in a very thorough

18   way.

19         So, I was hoping that he might be here today, so that

20   I could engage him further on this, but what he said, among

21   other things, is that his attendance was pretty good, but,

22   overall, he's not fully engaged with all treatment providers,

23   he does not fully appreciate the extent to which he needs

24   mental health treatment.  He believes that Mr. Sherlock would

25   not be as engaged in treatment if his sentencing were not

J96KSHES

1    looming.  He describes Mr. Sherlock as an inconsistent

2    self-reporter and unreliable informant.  That's what you were

3    just alluding to.  And I agree, I'm not sure what that means

4    exactly, other than to say that, to the extent that reports or

5    expert opinions are based on things that Mr. Sherlock has said,

6    it may be that it's not as reliable as might be wished.

7            But Dr. Cromer also indicated that he thought

8    Mr. Sherlock does not take treatment, especially substance

9    abuse treatment, seriously.  It also indicated that with

10   respect to his intelligence, that he's, in some ways,

11   intelligent, that he's -- if something is interesting to him,

12   he can retain information, some suggestion that he did research

13   on polygraph tests and IQ tests, perhaps with a view towards

14   faking bad when taking the tests.  I'm not sure that I'm

15   prepared to say that the results in Dr. McCarthy's report or

16   Dr. Cohen's report are the result of faked tests.  I think,

17   clearly, there's cognitive issues and other issues that have

18   been identified very well in the reports.  So, I'm not going to

19   put a lot of stock in that.  But it does suggest that this is

20   someone who's not serious about treatment, hasn't really done

21   that well.

22           He also indicated, with respect to risk -- at least

23   for me this goes to risk -- that Mr. Sherlock reported that

24   he's very attracted to prepubescent individuals, but would

25   never have contact.  That's self-reporting.  But there was a

J96KSHES

statement in here that the victim empathy expressed by

Mr. Sherlock is lip service.  He minimizes there was a victim

and acts like it was a victimless crime.  He's made comments

that he had a profile in a chatroom to potentially meet people

who were underage.  That was a new fact I hadn't heard before.

So, that was troubling to me.

          And then I guess the phone that was the subject of a

hearing back in May, Mr. Sherlock told Dr. Cromer, I gather,

that he purchased the phone two days prior, but, according to

Dr. Cromer, when the staff looked through the phone, it

appeared that he had the phone for more than two days.

          So, finally, Dr. Cromer concludes that -- when asked

if he believed that Mr. Sherlock had made progress in

treatment, Dr. Cromer stated, very small, it's hard to trust

him, he makes it seem good, he's made a little bit of progress,

but he doesn't take it too seriously.  He's superficially

engaged.

          So, that was not what I was hoping to hear, certainly,

and I guess I was hoping you might respond to that.

          MS. SHROFF:  I'm happy to respond to that, your Honor.

          THE COURT:  Okay.

          MS. SHROFF:  So I have two separate responses to it.

          One is that Dr. Cromer has been engaged with

Mr. Sherlock for quite some time.

          THE COURT:  Yes.  He's not somebody who's met him for

J96KSHES

1    a couple of hours and administered some tests.

2              MS. SHROFF:  Right.

3              THE COURT:  He's somebody who is his treating

4    psychiatrist, right?

5              MS. SHROFF:  Right.  And this treating psychiatrist

6    has access to Mr. Sherlock's guardian and mother.  I think she

7    is, by any standard -- be it mine, the government's, or the

8    Court's -- an extremely engaged caretaker even according to

9    probation.

10             THE COURT:  Yes.

11             MS. SHROFF:  If Dr. Cromer's concern was so heightened

12   about Mr. Sherlock's participation, there was no such mention

13   at all to his mother, there was no such mention at all to a

14   pretrial services officer, who is also extremely engaged,

15   Mr. Moscato.  Not only that, we sent Ms. Veasley out to the

16   facility over and over again, and Dr. Cromer made no such

17   mention to her.

18             Dr. Cromer knows that Mr. Sherlock has a lawyer, has a

19   prosecutor, and has pretrial and probation, and not once has

20   Dr. Cromer ever reached out and said, this person is not

21   participating as I'd like him to, can we arrange for an

22   intervention, and we would have.

23             THE COURT:  Well, that's not the issue, though.  I

24   think the issue is his description.  You're taking issue with

25   the description?

J96KSHES

1          MS. SHROFF:  No.  I'm taking issue with the fact that

2     I do not know necessarily what this description tells the

3     Court, especially because it relies on some amount of

4     subjective thought.  To say that Mr. Sherlock has participated

5     in therapy because sentencing is looming, okay, so what?  He's

6     going to participate in therapy because he's on supervised

7     release.  He is --

8          THE COURT:  But less motivated is the point.  That's

9     the point, I think, Dr. Cromer was making.

10          MS. SHROFF:  Right.  But, honestly, and I don't mean

11     to be flip at all, and I'm not being flip -- I hope the Court

12     understands that -- if I do my work, whether I believe my

13     client is guilty or innocent, what does it matter as long as I

14     do the work?

15          THE COURT:  But Dr. Cromer is suggesting he's not

16     really doing the work.

17          MS. SHROFF:  I'm getting there, your Honor.

18          So, I discussed this issue not just with Mr. Sherlock,

19     but also with Dr. Cohen.  And Dr. Cohen can speak to this, if

20     the Court wishes, but there is a tendency among people who are

21     on the autism spectrum to sometimes not be able to fully

22     understand the consequences of what they're doing, and, also,

23     their affect is such, that when it is received by society, it

24     is often misperceived.  The important thing here is that

25     Mr. Sherlock continues to engage.

J96KSHES

1          Now, if he doesn't engage to the point where he has

2     the same level of insight as you or I, I think that's too high

3     a standard to set for Mr. Sherlock.  But I do think this:

4     Mr. Sherlock is in therapy.  Dr. Cromer has not discharged him

5     from the work he is doing with him.  So whatever incremental

6     progress he's making, it's still progress for Mr. Sherlock.

7     Mr. Sherlock has, in fact, listened to the directive of this

8     Court since the last time he came.  You gave him an opportunity

9     to make sure he did not use drugs again, and he has not tested

10    positive.

11          In response to that, even while he is with Dr. Cromer

12    in therapy, he has started to go to a group for AA and NA.

13    That is corroborated by the people in his program because they

14    monitor his going.  He is trying to learn more about drugs and

15    his addiction, so he can cope with it.  And these are progress

16    data points that may not be good or great for us, but for him,

17    they are leaps and leaps from where he was before.

18          I remind the Court that in 2017, when Mr. Sherlock was

19    first arrested and prior to that, he was suicidal.  He had

20    three suicide attempts.  While he was in the program, the only

21    way he could deal with his major depressive disorder was to try

22    and hang himself with a belt.

23          This is progress.  It may not be the progress you want

24    to hear, the words may not be the words we want to hear, but it

25    is definitely progress.

J96KSHES

```
 1              So, I'm asking this Court, let's just say -- and I
 2     certainly have no intention of asking for a short period of
 3     supervised release in this case, because I know that that would
 4     not be a good ask for him.
 5              THE COURT:  Well, I think it's a mandatory five years.
 6              MS. SHROFF:  Right.  Right, I know.
 7              But regardless of whether it is a mandatory five years
 8     or not, I wouldn't ask for that because for him, treatment is
 9     imperative.
10              So, let's just posit here for a minute that the only
11     reason Mr. Sherlock continues in treatment is because this
12     Court has him on supervised release, and everybody in this
13     building, and 40 Foley, and elsewhere knows that Judge Sullivan
14     keeps his own VOSRs.  If that is the sole reason Mr. Sherlock
15     continues in therapy, but does the work, is that so bad?  It's
16     not.  He will do the work.  Sooner or later, his insight will
17     grow incrementally for his sake, I hope, but unlike many a
18     defendant that walks into this building, he does have two very
19     strong supporters here.  He has his mother, who's involved in
20     care, and she can certainly become more involved as Dr. Cromer
21     and she take the correct steps.  That's number one.  And she is
22     irreplaceable for him.
23              And number two, he will have probation.  And probation
24     from the Southern District of New York is an excellent resource
25     for him.
```

J96KSHES

1          THE COURT:  I agree with that.

2          MS. SHROFF:  Right.

3          So, between the two, I do not worry that he will not

4   get the type of treatment that Jennifer McCarthy is worried

5   about, and certainly our office has Dr. Cohen at his disposal

6   should he need to consult with her.

7          So, in terms of his growth, I can't speak to the

8   progress so far, but I can only tell you this:  He is engaged,

9   and that's 90 percent of therapy, that he is there.  He shows

10  up, he's trying to do the work.  That's one.

11          Two, I fail to fathom this risk analysis that

12  Dr. Cromer is undertaking.  At one point Dr. Cromer says that

13  he thinks without therapy, he would be at risk of offending

14  others, continuing to watch child pornography.  Well, we agree.

15  We agree that there is a risk.  The question is how much of a

16  risk.  The question is what therapy will do for him.  I mean,

17  surely, I would be intellectually dishonest if I told the Court

18  there is no risk of him watching child pornography again.

19  That's just not a truthful statement from me.  The question is

20  whether he will reoffend.  And given the placement, given

21  probation, and given his mother, I think the chances are

22  extremely low.  I am not a doctor, and even if I were, I don't

23  think even Dr. Cohen would say that there is no risk as to any

24  patient, but, again, she is here to explain that to the Court.

25          I do not think that he is -- I don't know what that

J96KSHES

1    phrase was that the Court used.

2              THE COURT:  Well, Dr. Cromer used it.  I don't

3    think --

4              MS. SHROFF:  No, no, I meant that you repeated.  I

5    apologize.

6              That he is -- I don't know what it was, but, anyway,

7    that he would fake bad when taking tests.  This is the client

8    who said clear as day, not only to Dr. Cromer over and over

9    again, but he said it to Dr. Cohen, and he said it to McCarthy,

10   that he had an interest in child pornography.  If he wanted to

11   fake bad, I think, according to them, he is savvy at some

12   point, intellectually disabled at some point, but no matter

13   what, he comes out being able to con someone into thinking that

14   he has no interest in child porn.  But he said the opposite, he

15   said he had an interest.

16             And in dealing with that issue -- I talked to

17   Dr. Cohen, and she says that he has an addiction problem, which

18   is why sending him to AA and NA, which is fairly recent, but

19   helping him, was something that was a positive step for

20   everyone because AA and NA at least will teach him coping

21   methods and how to deal with addiction.  And nobody's forcing

22   him to go to AA or NA -- he's going on his own -- that is

23   initiative.

24             So, look, I think I can pull out six sentences from

25   one report, the government can pull out eight, and we can go

J96KSHES

1   back and forth on this all day long.  I honestly do think that

2   we could literally have each side have specific statements that

3   support their position.

4           I ask the Court to consider something.  Not only does

5   Mr. Sherlock have all of these intellectual disability issues,

6   on top of that, he's had this trauma his entire life, he had

7   the trauma of himself at a young age not being physically fit,

8   he had the trauma of being disliked and picked upon in school,

9   which, you know, we can all shrug at, but it's a big deal.  He

10  had a brother who died, who died after a terribly long

11  debilitating illness and had a prolonged period of complete

12  neglect from his parents because her hands were too full

13  watching her second child die.  Then his father died.

14          You're talking about a mother who's completely

15  overwhelmed and still doing all she can for him.  And he has

16  had this trauma, this disability, and this addiction.  It has

17  not been an easy road for him.

18          THE COURT:  No, I don't think anyone would suggest

19  that it's been easy.

20          MS. SHROFF:  So I ask this Court -- not just easy, I

21  mean easy in the sense that -- not that somebody is saying feel

22  sorry for him, but I'm suggesting that the 36 months that

23  probation recommends, is it just for punishment?  Is it to make

24  sure that because he watched child porn, and there has to be a

25  jail sentence, and only a jail sentence that will punish?  Is

J96KSHES

1    there really that little flexibility in the sentencing scheme,

2    that there is no other way to punish Mr. Sherlock?  Is not

3    living away from his mother, forcing him to deal with these

4    issues, being a felon, having a federal case, having all of

5    these issues that he is going to have to deal with successfully

6    without a hiccup for five years of supervised release with the

7    limitations of supervised release, is that not sufficient

8    punishment for him?

9            Honestly, I'm an advocate, you know that I'm almost

10   always asking for a nonjail sentence, but in this particular

11   case, it will interrupt placement, it would interrupt

12   treatment --

13           THE COURT:  But the treatment by the treatment

14   provider has not been that great.

15           MS. SHROFF:  Okay.

16           THE COURT:  Look, I think you have stronger arguments

17   if the treatment provider was saying, oh, he's night and day

18   from where he was before, but that's not what he's saying.

19           MS. SHROFF:  But night and day shouldn't be the

20   standard for a person like Mr. Sherlock is what I'm trying to

21   tell the Court.

22           THE COURT:  I don't know what the standard is for

23   Mr. Sherlock.  The point is that I think the argument that his

24   treatment would be derailed by a prison sentence is harder to

25   make when his progress, according to his treatment provider,

J96KSHES

1   has not been that great.

2              MS. SHROFF:  But that's what I'm saying, I do not

3   think that it's fair for the doctor to say it hasn't been that

4   great now, having done nothing to make it better or engaged his

5   mother --

6              THE COURT:  But I think the point is that his mother

7   can't do the treatment for him.

8              MS. SHROFF:  But his mother can encourage --

9              THE COURT:  But he's been encouraged the whole way.

10             MS. SHROFF:  I don't agree, your Honor.  I think his

11  mother, if she were in group therapy with him, with Dr. Cromer,

12  I think maybe you'd have a different result.  I think his

13  mother didn't even know until we pointed this out to her.  She

14  herself, if you want to question her, she's here.

15             THE COURT:  No, look, you were the one who attached a

16  letter from Dr. Cromer.

17             MS. SHROFF:  I attached the letter because I thought

18  it was important for the Court to know that a person with

19  certain limitations has at least shown up.  You have --

20             THE COURT:  But he had to show up.

21             MS. SHROFF:  No, you've had defendants that you've

22  ordered into therapy that don't show up, and you remanded them.

23             THE COURT:  But that wasn't the issue.  But, in any

24  event, at the first sentencing, you attached a letter from

25  Dr. Cromer that, as I noted, didn't say much.  It was damning

J96KSHES

1    with faint praise.  And now I have further reports from

2    Dr. Cromer, who is his treatment provider, saying his progress

3    had not been that great.

4            MS. SHROFF:  Maybe he needs a different treatment

5    provider.  Maybe the fault is the treatment providers, I don't

6    know.  But probation is well equipped to handle this far better

7    than any Bureau of Prisons.

8            THE COURT:  All right.

9            MS. SHROFF:  There is really clear differentials in

10   the quality of treatment that Mr. Sherlock would get.

11           And I do tell the Court that placement for

12   Mr. Sherlock is extremely important.

13           THE COURT:  Yes.

14           MS. SHROFF:  And displacing him -- and I think that

15   perhaps Dr. Cohen can also speak to that if the Court wants.

16   Placing individuals such as Mr. Sherlock is monumentally

17   difficult, and his mother is not going to be able to take care

18   of him as she ages.  It's just the truth.

19           THE COURT:  You mean placing him going forward in

20   residential and --

21           MS. SHROFF:  Yes, she can't take him back home now.

22   It would not be a good workable solution.  He has placement,

23   and that placement is doing very excellent things for him.

24           The placement that he is in now is even more

25   structured.  It has greater control because he is now living

J96KSHES

with people who are even less on the IQ level towards -- I
don't want to use -- you know what I'm saying.  It's a more
structured program right now.  To pull him out of that, I do
not think it would further a goal of sentencing.

        So, for all of these reasons, your Honor -- if I
could, if I thought that Mr. Sherlock could deal with the
stress of not getting sentenced, I would ask you to just
continue and see how he progresses, but it occurred to me while
I was going through all the sentencing, is that basically
that's what you're going to do anyway with the five-year
supervised release because this Court is very involved.

        THE COURT:  Look, I have to sentence him.  It's been
two years now.

        MS. SHROFF:  Right.

        So, that's what I'm saying.  I'm saying that
sentencing him -- the fact that sentencing is looming, and just
in case you sentence him, he's not going to drop off the
treatment floor or the treatment graph and suddenly disappear.
He is on five years of supervised release.  I just think this
man has been punished enough, and some of his punishment is
innate.  I think that sometimes we forget how fortunate we all
are.  We don't have innate hardships.  His hardships have not
only been innate, familial.  And I just ask the Court to
consider that I do think that Mr. Sherlock is really an outlier
of defendants that come before this Court.

J96KSHES

1          THE COURT:  Well, I think that's fair.  All right.

2     Thank you, Ms. Shroff.

3          Ms. Rothman?

4          MS. ROTHMAN:  Your Honor, I just want to respond to a

5     few points by defense counsel and, of course, answer any

6     questions the Court has.  I don't think there is really a need

7     for me to go over everything because there's been so many

8     submissions in this case, and the Court has an abundance of

9     information.

10          Showing up and doing the work are two different

11     things, and I think the Court realizes that.  What we see from

12     Dr. McCarthy's report, as conveyed to her by Dr. Cromer, is

13     someone who's not committed to treatment.  And the concern

14     there is the defendant's addiction to child pornography is not

15     going to stop without treatment.

16          So, if this Court imposes a nonincarceratory sentence,

17     and the defendant does not have the commitment to treatment,

18     we're going to find ourselves back here again with another

19     violation, which everybody wants to avoid.

20          What I'm confused about is whether this treatment

21     facility is working or not, because, at the beginning of

22     today's proceedings, I think there was a suggestion that

23     probation and Dr. Cohen will have a different treatment plan

24     for the defendant, that his current placement is not working,

25     and we should go somewhere else.  But then, at the end, I'm

J96KSHES

1    hearing that his current treatment is the best place for him

2    and he's making great progress there.  And simply that's not

3    true, and we have a report -- information from people that see

4    him regularly, which is saying the complete opposite.

5          THE COURT:  Well, I think Ms. Shroff can speak to this

6    if she wants, but I think there are sort of two things to

7    remember.  One is placement in a residential facility and the

8    other is treatment.  They're not coterminous.  The treatment

9    provider is not the residence provider.

10         So I thought Ms. Shroff was alluding to his placement

11   in a group home, which that would be affected by a prison

12   sentence for sure.

13         MS. ROTHMAN:  Correct, your Honor.  But this is not a

14   situation where the defendant is making great strides in that

15   group home.  If that were the case, you could see a concern

16   with taking him out of that facility, putting him in a

17   correctional facility for a period of time, and the trauma that

18   would cause to an ongoing course of treatment and stability.

19   That's not what we have here.  We have someone who, at that

20   treatment facility, used marijuana and someone who, at that

21   treatment facility, at that residential facility, obtained a

22   cell phone, which he had for a period of time.  What did he do

23   with that cell phone?  He didn't check sports or talk to his

24   mom.  He went on an escort service, something that's closely

25   related to his addiction of child pornography.  Not the same,

J96KSHES

1      but closely related.

2              I don't believe that the purposes of sentencing would

3      be served with a nonincarceratory sentence here.  The defendant

4      already had that opportunity with his first conviction, and

5      that didn't work.  The defendant has not shown the commitment

6      to change that I think would warrant, or could possibly

7      warrant, a variance below the guidelines here, to a

8      nonincarceratory sentence.

9              This is a case -- and we recognize that prison will be

10     very difficult for Mr. Sherlock.  No one is disputing that, he

11     is a complicated person, but in thinking about all the things

12     this Court needs to consider -- deterrence, general deterrence,

13     specific deterrence, keeping the community safe -- all of those

14     factors warrant an incarceratory term, and, here, the

15     guidelines are reasonable.

16             THE COURT:  Well, that's what I was surprised at.  So

17     you're still -- after the reports, your view is still a

18     guideline sentence is appropriate.  Probation is recommending

19     about half the guideline sentence, but your view is that five

20     to six and a half years is appropriate.

21             MS. ROTHMAN:  Yes, your Honor.

22             THE COURT:  So, with the constellation of issues and

23     problems that Mr. Sherlock has, both problems that would make

24     prison harder for him, problems that make him -- I think, in

25     fairness to the reports I've seen, that make him sort of more

J96KSHES

susceptible to an addiction than others, your view is that he

should simply be treated like somebody else who's in that same

range?

          MS. ROTHMAN:  Your Honor, I don't think this is a case

where -- the answer is, yes, your Honor, we do.  This is not a

case where the child pornography guidelines are so extreme,

such that the concerns of Dorvee, I think, would apply here.

In the world of child pornography cases -- and I speak from my

own cases, my colleagues' cases -- it is not uncommon to see

many of the same issues that affect Mr. Sherlock affect other

defendants.  And I don't think it's appropriate to say that, as

a matter of course, I'm always going to go down where the

guidelines are the starting point because of certain conditions

that affect individuals who tend to view, receive, exchange

child pornography.

          So, yes, we believe here the guidelines are reasonable

and appropriate, particularly for a two-time offender.  The

reason they're so high is not because of the offense level --

there are 25 -- it's because of category II.  And the reason

for that --

          THE COURT:  Wait, wait, wait.  This is an area that I

can speak to, okay?  So if you were in category I, his

guideline range would be 57 to 71.  Because he's in category

II, he's 63 to 78.

          MS. ROTHMAN:  That's right, your Honor.  I misspoke

J96KSHES

1    that.

2             THE COURT:  So that's an increment, but that's not

3    what's driving this, it's the offense level.

4             MS. ROTHMAN:  They're higher because of the criminal

5    history.  I don't think this is a case where you're seeing

6    enhancements due to volume, due to videos, which are often the

7    things that boost the offense level for child pornography

8    cases, where I think it's one video counts as -- I don't have

9    the guideline -- multiple images.  We're not seeing that here.

10   So, yes, notwithstanding the defendant's personal

11   characteristics, what we see here is a repeat offender who has

12   not committed to change, who has shown, in fact, the opposite

13   to his treatment providers and the Court.  And so, with all of

14   those things to consider, we don't see a basis to go below the

15   guidelines.

16            THE COURT:  Okay.  Thank you.

17            Ms. Shroff, anything you want to say in response?

18            MS. SHROFF:  Yes, please, your Honor.

19            So, there is no volume of child pornography, there are

20   no multiple videos of child pornography.  According to the

21   government, he has few images and few videos, such that Dorvee

22   should not kick in.

23            THE COURT:  Well, the point is that Dorvee involves

24   somebody who was going to do more time in jail than murderers,

25   than child rapists.  That was one of the things that the

J96KSHES

circuit was talking about in Dorvee.

MS. SHROFF:  One.

THE COURT:  So, in fairness to Ms. Rothman, the guidelines here are nowhere close to where they were in Dorvee.

MS. SHROFF:  True.

THE COURT:  They're very, very different cases.

MS. SHROFF:  True.  But in Ms. Rothman's presentation, she notes the absence of numerous videos and the absence of numerous photos, which partly forms and informs the nature and characteristics of the offense.  It shows that he is not a prolific child pornographer.  He's not somebody who downloaded tons and tons of videos.  He's not somebody whose addiction is so crippling, that he has a mandatory minimum of even five years.  I just wanted to note that admission by the government, number one.

THE COURT:  The guidelines -- there's no dispute as to what the guidelines are, so you don't need to spend a lot of time on that.

MS. SHROFF:  I know.  I just want to point out two things, your Honor.

THE COURT:  But in terms of the addiction, let me just get to a point you just made, what's described in both of the reports is somebody who was downloading on a regular basis.

MS. SHROFF:  I'm going to get there.

THE COURT:  On a daily basis.

J96KSHES

1        MS. SHROFF:  I understand.  I'm going to get to the

2   addiction.

3        I just want to point out that paragraphs 42, 43, and

4   44 of the PSR, that's enhancements of four, plus two, plus two,

5   which would be eight, which would all be subject to Dorvee, but

6   I just note that, and I move right along -- well, actually, 45

7   as well.  So, I just want to point that out and move along, so

8   that the record on that is clear.  Dorvee would kick in for all

9   of them.

10        But let me --

11        THE COURT:  I'm not -- we're all talking about Dorvee.

12   Dorvee would kick in meaning what?

13        MS. SHROFF:  Meaning that the government's position

14   that United States v. Dorvee doesn't apply to the

15   reasonableness of these guideline calculations is not a

16   statement we agree with for purposes of appeal.  That is all

17   I'm saying.

18        THE COURT:  But, look, Dorvee is the law of the

19   circuit, so it applies.  I think the issue is whether this case

20   is distinguishable from Dorvee, and, in many ways, it is.  But

21   the point is that the guidelines are not magic, and the

22   guidelines are not entitled to any presumption of correctness

23   that courts have an obligation to go beyond the guidelines.

24   So, the guidelines are relevant, they're important, they serve

25   a purpose, but it is often the case that they don't even come

J96KSHES

close to telling the whole story, and courts have an obligation

to look at other things.

        So, that's the message of Dorvee.  I get that message

loud and clear.  And, of course, I've already said all the

factors I am going to consider.

        MS. SHROFF:  Let me just address the other issues.

        The government then argues that because he had use of

drugs and had looked up an adult child pornography site using a

phone, that somehow he's more deserving of punishment, and

prison is the cure for that.  I just want to address for the

Court, just pick any five newspapers in the last three or four

weeks, and I think we can all agree that there is no place that

has more cell phones and more drugs than the Federal Bureau of

Prisons, including the MCC, including the MDC.  And this is --

as one newspaper reporter said, there are more phones than Best

Buy at the Federal Bureau of Prisons.

        So, putting him in jail, warehousing him in a jail, is

sincerely not going to keep him away from a phone or drugs.

What is going to keep him away from a phone and drugs are two

things:  Mr. Sherlock's growing understanding that that would

be wrong and bad for him and the strictures of supervised

release, which would tell him, as you have done before and he

has shown to you, that he can actually listen to the Court's

directive and do better.  So, this Court gave him a chance, did

not remand him, he's had not one positive drug test, he has not

J96KSHES

1    gone back to using any cell phones, and that is incremental

2    progress.  It's not the level of progress you and I want to

3    see, but it nevertheless is progress.  Not all of our children

4    go to gifted and talented, not all of them skip a grade, some

5    of them stay behind one or two grades, and that is

6    Mr. Sherlock's lot.  But he is doing better.  He's not just

7    doing as well as we want him to.

8              That's what I'm trying to tell the Court.

9              THE COURT:  No, I understand what you're saying.

10             MS. SHROFF:  I'm not sure if Mr. Sherlock wants to

11    speak, your Honor.  May I just have a minute with him?

12             THE COURT:  Sure.

13             MS. SHROFF:  Thank you.

14             (Defendant and counsel confer)

15             MS. SHROFF:  Your Honor, Mr. Sherlock says he doesn't

16    want to speak.

17             THE COURT:  That's okay.  He has no obligation to, and

18    as I always say, and I'm not sure if I said it yet, but the

19    fact that you choose not to speak will not be held against you

20    in any way.  My point was simply that you have a right to, and

21    if you'd like to, you'd be very welcome to, but if you don't

22    wish to, that's quite all right.

23             MS. SHROFF:  And, your Honor, you were correct about

24    my issue with the placement.  I meant placement in the group

25    home.

J96KSHES

1          THE COURT:  Yes.

2          MS. SHROFF:  And that probation and Dr. Cohen are

3     available to work out treatment and assist, but the decision

4     for treatment is really for probation and the group home, not

5     for us.

6          THE COURT:  All right.

7          You mentioned probation a couple of times, and

8     probation is here, which isn't always the case.  So,

9     Ms. Millan, is there anything you wanted to add?

10          MS. MILLAN:  No, your Honor.

11          THE COURT:  So, probation has recommended the same

12     sentence both times.  We've had a revised presentence report,

13     and the recommendation, both in the first and the last, is 36

14     months.  That's what you're recommending?

15          MS. MILLAN:  Yes, your Honor.

16          THE COURT:  Yes?  Okay.

17          As those who have -- Ms. Shroff, Ms. Rothman, and

18     others who have appeared before me before know, sometimes I

19     take a short break to just collect my thoughts.  I think it's

20     important to do that.  I've been preparing for this sentence

21     for a long time.  I've read everything multiple times.  I

22     recognize the enormous impact this sentence will have on

23     Mr. Sherlock and on others, including his mother, but others as

24     well.  I also recognize the significance of this crime and the

25     fact that there are victims, perhaps not identified victims,

J96KSHES

1    but nonetheless victims.  But as much as I prepare, I also want

2    to be open to hearing arguments, to hearing what lawyers have

3    to say, or sometimes defendants, or victims, or others who

4    speak at a sentencing.  So it's important to come to a

5    sentencing openminded while still being prepared.

6          So, what I'd like to do is take maybe five minutes to

7    collect my thoughts, think about what I've heard today from the

8    attorneys, and then I'll come back, and then I will announce

9    the sentence I intend to impose, I'll state my reasons for it,

10   I'll then make sure that I haven't done anything illegal or

11   improper, and then I'll formally impose the sentence.  So just

12   a few minutes.  Thanks.

13         (Recess)

14         THE COURT:  Thanks for your patience.  As I've said

15   before in this case, I only get to do this once, so it's

16   important that I really have the information I need and also

17   have the opportunity to really think hard about the arguments

18   that have been made.  So I think I have done that.  It's been

19   about two years, I guess, since I first met Mr. Sherlock, when

20   he first came before me.  The complaint in this case was, I

21   guess, August of 2017.  So, it's been a while, and people

22   change, people aren't static, people do change, but I have a

23   pretty good indication as to who Mr. Sherlock is, the

24   challenges he's been dealing with, and will continue to deal

25   with, and his prospects for doing that successfully.

1              In our system, Mr. Sherlock, a judge has to explain

2      themselves.  The judge has to explain his or her reasons for a

3      sentence.  I think that's good.  I don't think anybody should

4      have to wonder what the judge was thinking when the sentence

5      was imposed.  So I'm going to go through now what sentence I

6      think is appropriate and why.  None of this is designed to be a

7      lecture, but it is important to make a record, both for your

8      benefit, for your mom's benefit, for the benefit of the public.

9      That's why we do it all in open court, with a court reporter,

10     so that it's all transparent.

11             So, I guess I'll begin with what is obvious:  This is

12     a serious crime.  This is a crime that has a real impact on

13     people.  There are victims in this case.  We don't know them,

14     they're not here, but there are victims, and you know that.  I

15     think that -- I mean, there is evidence here that reflects that

16     you were aware of that even before you were arrested.  And

17     there are statements attributed to you while you've been in

18     treatment to reflect that you understand that these are

19     victims, and that there's a real impact, not just to the

20     physical abuse that these victims had to endure while the

21     videos or photos were made, but that there's continuing abuse

22     just knowing that people are looking at the images of their

23     abuse and being gratified by it.  That psychologically is a

24     very damaging thing.  Sometimes I get letters from victims like

25     that, and they're attached to the report because law

J96KSHES

enforcement has been able to identify a victim, and so the

victim sometimes will make a statement saying, you know, ten

years ago, when I was 12, I was, you know, videoed or

photographed by my father in a sexual act, and they will talk

about the impact that had on them, and they will sometimes talk

about the impact of knowing that others are still viewing that

photo or that image for sexual gratification, and they will

talk about how traumatic that is.

          We don't have that here, but I think you understand

that.  And I don't want to lecture on it.

          It does seem that Dr. Cromer thought that maybe you

don't appreciate that as much as you need to.  It's hard to

assess whether that's true or not.  I just want to stress, this

is not a victimless crime.  Every viewing of child pornography

has an impact.  It creates a market or a demand for these types

of images, and it has a real impact on the people who were

abused.  So, I'll start there.  That's why it's illegal, that's

why the penalties for this kind of crime are severe, that's why

the guidelines are high.  So that's the first point I want to

make.

          The second point I think I obviously need to make is

that this is not the first time you have done this.  It's not

the first time you've been prosecuted for this conduct.  I

don't get a ton of these cases, but I get enough over the

years, but it's rare that I get somebody who has done this more

J96KSHES

than once.  In your case, you did.  There's a prior conviction

in the state for which you got a term of probation, but that

makes your returning to it your second offense, this offense,

it makes you more culpable by virtue of the fact that you've

already had your wakeup call.  You went through the system, you

went through court proceedings, you were sentenced by a judge,

you knew all of that, and that should have had an impact, and

it didn't.  And it makes you more culpable.  That is relevant

to sentencing.

          So, I would say this:  Ordinarily, if I had a person

charged with this crime, who admitted this crime, who had done

it before, and previously been prosecuted and given a

noncustodial sentence, I would say ordinarily these guidelines

would not offend me.  Some judges have real problems with the

guidelines in this space, and that is empirically true.  It is

a fact that judges depart from these guidelines at a higher

rate than other guidelines, no question about it, and there's

been a lot of discussion about whether they are pegged too

high.  But I would say, for this crime, on these facts, with

your history, I think this is not one of those cases where I

would be that disturbed by it.  I think every case is

different, but I think, based on the objective factors here, I

would say these guidelines are about right.  It would seem to

me that's right for a person who didn't get the message the

first time, then we've got to send the message.  So that would

J96KSHES

be 63 to 78 months.

          But everybody's different, every case is unique, and I
think in your case, certainly there are unique factors at play
here.  I think that the challenges that you have had in life,
both in terms of the family issues that you've had with the
loss of your father and your brother, with the real cognitive
challenges, with the autism spectrum disorder that Dr. Cohen
talked about, I think that's a very real thing, and obviously
that has an impact on you.  It has an impact, I think, in terms
of your culpability for this crime, and, also, I think, it has
an impact on rehabilitation treatment and other things that are
also important aspects of sentencing.  So I thank Dr. Cohen for
being here and thank you for the report.  I had a lot of
reports.  I had Dr. Kleinman's report, I had Dr. McCarthy's
report, I had Dr. Cohen's report.  I also had the benefit of at
least statements from, and a letter from, Dr. Cromer.  So,
there are some differences.  I have to say, I don't think the
differences were that great, for the most part, in these
reports.  They certainly didn't shock me.  They seemed to
confirm what I perceived, which was that this is a person who's
got a lot of challenges and who's different than most
defendants and different than most defendants in cases
involving child pornography.  And that, I think, is not a
particularly controversial statement.  They disagree on some
things, about pedophilic disorder.  That's a statement and a

J96KSHES

diagnosis that was made in 2015 originally in the context of
the state case.  It was repeated by Dr. Kleinman in his report.
Dr. McCarthy seems to echo it.  There's been some challenging
of her qualifications to make that sort of an assessment.
Dr. Cohen suggests that the autism spectrum disorder might mask
or impact a diagnosis, and I credit that.  To the extent
there's any difference between the reports, I guess I would
defer to Dr. Cohen, who looked at a very specific aspect of
Mr. Sherlock's experience and mental health.

        But I don't think it really matters that much,
ultimately, as to whether it's one disorder or another.  It
seems to me that there are risks.  The statement to Dr. Cromer
troubled me, about apparently Mr. Sherlock saying that he had
gone into chatrooms and was targeting younger people.  But
there's no evidence that Mr. Sherlock has ever had any contact
with a minor, and it's not clear that he would in the future.
I don't think there's any basis for saying that there's a high
risk of that.  There is a risk of that, but it's hard to assess
what that is.

        But I do think the fact that there is a prior
conviction here does speak to the need for some deterrence,
specific deterrence.  And Dr. Cromer's statements, I think,
confirm that for me, suggest that some period of incarceration
is appropriate, to send that message.  And the other factor
that I think really does stand out for me is just punishment.

J96KSHES

I do think that this is a serious crime, and even with all the
challenges, with all the diagnoses, and empirically recognized
issues that Mr. Sherlock has cognitively, and socially and
emotionally, nonetheless, I do think that there needs to be
some punishment here.  Nothing close to the guidelines -- I
don't think that would be appropriate -- but I do think that a
noncustodial sentence after the prior conviction for the same
conduct and with a less than -- some progress, obviously there
was a lot of progress here -- I don't want to understate it --
but there were some setbacks that were disappointing.  That
also suggested to me that some term of incarceration is
appropriate, and that it wouldn't be appropriate to come down
as low as I might have had the performance with Dr. Cromer, had
there been no phone violation, had there been no marijuana use,
I think those things factored in along the margins, but,
ultimately, I'm pretty much where I was early on in this case,
and I think a sentence of 18 months is appropriate.

          Now, I agree with Ms. Shroff, placement really
matters, and so that will be with an opportunity to surrender.
So you won't be going in until you have a designated facility,
and I'm going to strongly recommend that you be housed at the
Devens facility in Massachusetts, which has a residential sex
offender treatment program, because I think that's the only one
of its kind in the Bureau of Prisons, and I think it's the best
program in the Federal Bureau of Prisons.  They also have

J96KSHES

1    another program, Sex Offender Management Program, I think, or

2    SOMP, there's SOTP and SOMP.  One is residential and the other

3    is not residential in the same sense; you'll be in the jail,

4    but you'll be in a different, less onerous program.  But my

5    recommendation is going to be that you be in the SOTP program

6    at Devens.  I'm going to have you surrender in 45 days, or

7    later if the designation isn't made in 45 days, and I'm going

8    to reach out to the Bureau of Prisons immediately after this to

9    make sure that they have what they need and that the

10   placement -- that they're able to accommodate my

11   recommendation.  I have every reason to believe they will, but

12   I can't guarantee it.  So I'm going to do everything I can to

13   make sure that that placement is respected -- the

14   recommendation, rather, is respected.

15           So, that's the sentence that I intend to impose, those

16   are my reasons for it.  So it's 18 months, which is half of

17   what probation recommended and probably a quarter of what the

18   guidelines are, but I think it's appropriate for all the

19   reasons I just said.

20           There is a mandatory term of supervised release of

21   five years, and I'm going to impose that here, with the

22   conditions that are set forth in the presentence report.  I

23   won't announce them right now.  I will when I impose sentence

24   formally, but that will be supervised release.

25           There is no fine that I'm going to impose.

J96KSHES

1          The government is not seeking restitution, right,

2     because you didn't identify the victims?

3          MS. ROTHMAN:  We're not, your Honor.  I think it's

4     just the JVTA fine.

5          THE COURT:  Right.  So it's a statutory $5,000

6     payment.  It's not exactly a fine, but it is a statutory

7     mandated payment, and that will be part of the judgment,

8     $5,000.  But no forfeiture and no restitution.

9          Is there any legal impediment to my imposing that

10    sentence?

11         MS. ROTHMAN:  No, your Honor.

12         THE COURT:  Okay.

13         Ms. Shroff?

14         MS. SHROFF:  No, your Honor.

15         THE COURT:  So, let me then ask you to stand,

16    Mr. Sherlock.

17         Mr. Sherlock, will you please rise.

18         Mr. Sherlock, having accepted your guilty plea -- I

19    guess it was back in October of 2018 -- having adjudged you

20    guilty at that time, I now sentence you as follows:  I sentence

21    you to a term of incarceration of 18 months, to be followed by

22    a term of supervised release of five years.  That term of

23    supervised release will include the following mandatory,

24    standard and special conditions.

25         The mandatory conditions are that you may not commit

J96KSHES

1    another federal, state, or local crime of any kind.  That means

2    even like jumping a turnstile.  You can't commit any crimes at

3    all.

4            In addition, you may not possess or use a controlled

5    substance of any kind.  That includes marijuana, it includes

6    harder drugs as well, but marijuana seems to be the drug that

7    has been giving you problems recently.  So, that's a condition

8    of your supervised release.

9            You also will have an obligation to cooperate in the

10   collection of DNA, as directed by the probation department.

11           You will also be required to register as a sex

12   offender, which you may have already done as a result of the

13   state case -- I'm not sure -- but, in any event, you will have

14   to do that.  So you'll have to -- as directed by your probation

15   officer, the Federal Bureau of Prisons, or any other state sex

16   offender agency, you'll have to register in the state where you

17   reside, where you work, where you're a student, or anyplace

18   else where you're spending time.

19           Now, I assume you're going to be in New York, so

20   that's New York's sex offender registration program, but you

21   have to comply with that.  If you don't do that, that would be

22   a violation of supervised release.  It would also be a crime.

23   So take that very, very seriously.

24           There are standard conditions, 12 in all.  They're set

25   forth in the presentence report.  I won't restate them.  I

J96KSHES

1    impose those in every case -- virtually every case in which

2    there is a term of supervised release.  One of them I'll

3    mention, which is, I don't think, really an issue for you, but

4    please take it seriously, you may not possess a firearm.  As a

5    convicted felon, you can't possess a firearm.  If you were to

6    possess a firearm, that would be a crime.  It would also be a

7    violation of supervised release.  It would get you back in

8    front of me, and probably back in front of another judge for

9    the crime and only bad things would happen.  Again, you have no

10   history of weapons or anything like that, so I'm not too

11   worried, but in every case, I mention that, just because gun

12   violence is such a problem, that I want to stress that.  Okay?

13       And then there are some special conditions that I am

14   going to impose here that are tailored to you based on your

15   experience so far and your needs.  And so, those will include,

16   first of all, that you will participate in an outpatient drug

17   treatment program.  That will include testing to make sure

18   you're not using any kind of drugs, particularly marijuana, but

19   any drugs.  That program will be outpatient.  It will be

20   approved by probation, but you have to attend it.  You can't

21   blow it off.

22       I'm going to authorize probation to share information

23   with the treatment provider and vice versa, so each can share

24   their tests and progress reports to make sure that you're

25   getting the treatment that you need and that you're making the

J96KSHES

progress you should.

         If you have the ability to pay for such a program, I'm
going to ask you to do that.  So, if you have a job, or
insurance, or Medicare, or Medicaid, or any of those things
that would help cover the costs, I'll ask you to help do that,
because these are expensive programs.  If not, then the Court
will bear the cost because it's imperative you participate in
the program on that.

         In addition, I'm going to have you take part in a
mental health treatment program, an outpatient mental health
treatment program.  That will also involve you covering the
costs, if you can afford it, through insurance or income.  I'm
going to direct you to take any prescribed medication directed
by the treatment providers.  I'm going to authorize the sharing
of information between the treatment provider and probation and
vice versa.

         Hopefully, the mental health and the drug treatment
will be part of one program -- there are often programs that
can combine them -- but if they need to be separate, then they
will be separate.  You have a lot of needs and issues that
should be addressed.  There's no shame in that.  Mental health
treatment is no different than physical treatment.  You need to
address things that are posing problems.  And so you have some
issues that are documented, and we want to make sure you get
that treatment.  So, Dr. Cohen can certainly be a part of that.

J96KSHES

I have no objection to her being involved in helping set up a

treatment program, but probation will take the lead in setting

up the program, and if along the way, we think that we need to

fine-tune it, and there's disagreement, you can always come

back to me, and we can talk about what's best.  But that will

be a condition, that you get mental health treatment.

You will also have to participate in an outpatient sex

offender treatment program.  That's something that probably

will be one program for everything, but if it needs to be

multiple providers, then that's what it will be.  The same

conditions:  Approved by probation with the sharing of

information between the treatment providers and probation, and

also the need to cover the costs of it, if you can.  Okay?

In terms of any mental health assessments or treatment

imposed as a consequence of this sentence, you essentially

waive your right to confidentiality -- that's true for all

these treatment programs -- but just know and understand that

things you say to a treatment provider might be shared with

probation and vice versa.

In addition to that, I'm going to direct you to

provide any requested financial information to the probation

officer to make sure you don't get in over your head

financially and just to make sure that you're living a

controlled lifestyle.  I'm not sure where you'll live,

ultimately, when you get back out.  Hopefully, it will be in a

J96KSHES

1    group setting like you have now, because that seems like it's

2    been, for the most part, productive.  We've had some setbacks,

3    to be sure, but I think that that might work.  You could, I

4    suppose, live at home, too, I'm not sure, but we'll address

5    that, I guess, when you get out.  We'll have to decide what's

6    best for you, and your mom will be involved with that decision,

7    but probation can hopefully help with that as well.

8         You are not to open new credit card accounts, or take

9    out loans, or anything like that without first getting

10   permission from probation.  You had a decent paying job prior

11   to this.  You were making about $60,000 a year, so that's not

12   bad.  And I have nothing to suggest that you can't manage your

13   finances, but it does seem that you need help, and so you, I

14   think, said as much in the interviews that you had.  So I want

15   probation to help, that's all.  But I'm not too worried about

16   you gambling or anything like that.  I had no indication of

17   that being a problem.  We just want to make sure that you do

18   things in a way that's going to keep you progressing.

19        In addition, obviously, we've had a problem, a

20   recurring problem, with you downloading child pornography, so

21   one of your conditions is going to be that you have to tell

22   probation about any websites that you're using, if you're using

23   websites and things through work.  I think it would be

24   ill-advised for you to be engaging in work where you frequently

25   have access to the Internet.  I think that probably wouldn't be

J96KSHES

healthy, given the addictive nature of this stuff and your

history with it.  But you have to let probation know about any

sites that you're going to, and you are barred from any kind of

sexually explicit material, particularly involving minors, but

I think adult pornography seems to lead you into child

pornography, at least from what's been reported, so no access

to any sexually explicit material whatsoever.  So that's laid

out explicitly in the presentence report.  I won't read it

verbatim here, but I'm adopting that as a condition.

          Ms. Shroff, did you have some concern with any of

that?

          MS. SHROFF:  No, your Honor.

          THE COURT:  Okay.

          All right.  Another condition was that you not have

deliberate contact with any child under 18 years of age unless

approved by the probation office.  You're walking on the

sidewalk, that's not what we're talking about, but you can't

sort of loiter around schools, you can't be deliberately

hanging out with underage people.  If you have relatives or

things like that, and you're going to Thanksgiving, then you

have to let probation know because we want to make sure that

there's no situations that might be potentially problematic.

          You have to submit your person, your property, your

residence, your place of employment, or vehicle, if you've got

one, any phones, or electronic devices you have, you have to

J96KSHES

submit to a search of those items, that probation can check to

make sure that there's no evidence of a crime or violation of

supervised release.  If they think there might be, then they

can search those things, and you'd have to consent to that.

You couldn't decline.

        You also have to let any other adults with whom you

share premises know that you're subject to this search

requirement.  So your mother is here, but if there are other

adults who you're later living with, you have to let them know

that you're subject to this requirement because sometimes your

stuff and their stuff could get commingled, and they need to be

able to take steps to protect their own privacy and their own

property.  So, you have to let them know that.  Okay?  I just

want to make sure I haven't missed anything.

        So you can't go to schoolyards or arcades,

playgrounds, things like that, where child or people under 18

might be congregating without getting permission from

probation.  Okay?

        As I said, I'm not going to impose a fine.

        There's a $100 special assessment that's mandatory.

You have to pay that.

        There's also a $5,000 payment pursuant to the Justice

for Victims of Trafficking Act.  That's a separate statute that

Congress passed, and it provides that a person who's convicted

of an offense like this has to pay $5,000, and so that will be

J96KSHES

part of the judgment.  Okay?  So you should pay that as soon as you can or in installments as we get out.  I guess I would say 10 percent of your gross income when you're out and working, if you're working.  That kind of depends on whether you're working or not, but that's something that do take seriously.  That's part of the judgment.  Okay?

I'm going to allow you to voluntarily surrender.  You know, you're not going to go in today, I'm going to give you 45 days.  In the meantime, the Bureau of Prisons will advise you as to what facility you should surrender to.  My recommendation will be that it's Devens and that you participate in the sex offender treatment program, the residential program.  So, hopefully, that will pan out, and if there's a problem, then let me know.  Okay?  If they say, no, you're going to Fort Dix, then we should talk about that.

So, Ms. Shroff, I'll ask you to let me know.  Okay?

But that will be my recommendation, and I'm hopeful that they will be able to honor it.  They can't promise, but they do intend to honor it, and I'm sure they will in this case.

Are there open counts?

MS. ROTHMAN:  No, your Honor.

THE COURT:  All right.

So, I should tell you, Mr. Sherlock, you have the right to appeal this sentence.  You didn't give up anything;

J96KSHES

you pled without any agreement.  You have the right to appeal

this sentence.  If you wish to appeal, you would need to file a

notice of appeal within two weeks.  Talk to Ms. Shroff about

that, she knows the drill, but it's a pretty strict deadline.

So, two weeks means two weeks.  I'll get the judgment out

today, so two weeks from today is when you'd need to file that

notice of appeal.

So, have a seat.

Is there anything else we need to cover today,

Ms. Shroff?

MS. SHROFF:  No, your Honor.

I may have an application for bail pending appeal, but

I need to talk to him before I make the application.

THE COURT:  Okay.  You can always make that request.

Ms. Rothman, anything else from you?

MS. ROTHMAN:  No, your Honor.  Thank you.

THE COURT:  Okay.

So, let me thank everybody for being here today.  This

has been a long process.  Worth it, because this is a

complicated case, and this is a young man who matters.  I

really believe that.  So I want what's best for him in the

future.  I've explained what the sentence is and why I think

it's appropriate, but the bottom line is that you're a young

man still, Mr. Sherlock, and the goal is to get you back out

into society and living a healthy and productive life, one that

J96KSHES

1   you can be proud of and one that can bring you happiness.  So,

2   that's my hope for you, and I want to make sure that we do

3   everything we can to make that a reality.

4           So probation, as Ms. Shroff said, is a very good

5   resource, but, ultimately, you've got to be the leader on this.

6   You're responsible for your life, so you've got to do

7   everything in your power to make sure you never come back to

8   this kind of conduct, because it would just be disastrous for

9   you and your family.

10          You've got to make sure you're doing everything you

11  can, so that you are dealing with the problems that have led

12  you to where you are today.  You're valuable, you matter,

13  you're a precious guy, your mother knows that, but we all know

14  that, and so let's make sure that we get you the things you

15  need.  If you're not getting what you need, that you let us

16  know, but that you never do anything that's going to bring you

17  back into a situation like this and never do anything that's

18  going to lead to further victimization of children, because

19  they're precious, too.  And the law is here to protect them.

20          So, good luck to you.  Thanks very much.

21  Ms. Sherlock, thank you and good luck to you.

22          I thank Dr. Cohen for being here as well.  I thank the

23  court reporter and probation.

24          All right.  Have a good day.  Thanks.

25                              * * *